[No. 1930.]

## BURRELL BOND *v.* THE STATE.

1. ROBBERY — CHARGE OF THE COURT.— The amendment to article 722 of the Penal Code, approved April 12, 1883 (General Laws, Regular Session, 18th Legislature, page 81), reads as follows: "If any person, by assault, or violence, or by putting in fear of life or bodily injury, shall fraudulently take from the person or possession of another any property, with intent to appropriate the same to his own use, he shall be punished by confinement in the penitentiary for life or for a term of not less than five years; and when the offense is committed by two or more persons acting together, and a firearm or other deadly weapon is used or exhibited by either of them in the commission of the offense, the person or persons so using or exhibiting the fire-arm or other deadly weapon shall be punished by imprisonment in the penitentiary for life or for a term not less than five years." *Held*, that the effect of this amendment is to prescribe three separate, distinct and independent modes in which the offense of robbery may be committed; first, by assault; second, by violence; and third, by putting in fear of life or bodily injury. Violence, without the concurrence of either one of the others, is a mode in which the offense of robbery may be committed, and in so charging the jury the court below committed no error. See the opinion *in extenso* on the question.

2. PRACTICE.— SPECIAL CHARGES, however correct, are properly refused if their substance is embodied in the general charge.

3. SAME — CONTINUANCE.— DILIGENCE in an effort to procure service of process upon an absent witness is one of the tests to be applied to the sufficiency of an application for a continuance. See the opinion for a showing of diligence *held* insufficient, and the statement of the case for evidence set out in the application for continuance *held*, in view of the evidence on the trial, not to be probably true, and therefore not sufficient to authorize the award of the continuance.

4. SAME — THE "RULE."— The exercise of the wide discretion necessarily conferred upon the trial judge with regard to the enforcement of the rule sequestering witnesses will not be revised on appeal except in clear cases of abuse. See the opinion for proceedings *held* not to amount to an abuse of this discretion.

5. SAME — EVIDENCE.— Error without prejudice is not reversible error, and the admission of incompetent evidence which could in no way prejudice the accused is error without prejudice, and is not, therefore, sufficient to authorize reversal. See the opinion in illustration.

6. SAME.— The defense objected that the State's question if the witness (a policeman) arrested the defendant "was calculated to influence the jury to accept the opinion of the policeman as to who committed the offense." *Held*, that the objection was hypercritical, and without merit.

7. SAME.— Note the opinion *in extenso* for the comments of this court upon certain remarks addressed by the trial judge to counsel in the case, in the presence and hearing of the jury, which, though condemned as improper, are *held* not to afford substantial ground for the reversal of the judgment.

8. SAME — EVIDENCE.— A State's witness was asked by the prosecution if any one informed the defendant of the cause of his arrest. The witness answered: " Yes, R. H. Pierce (the prosecuting witness) said 'There are the

two men that robbed me last night,' pointing out the defendant and George
Leonard." The defense objected that the evidence was hearsay. *Held*, that
the statement being made to the defendant, it was not hearsay. Moreover,
the error, if error at all, was immaterial, inasmuch as the witness Pierce,
when on the stand, testified to substantially the same fact.

9. SAME — PRIVILEGE OF COUNSEL.— It is contended on behalf of the appellant
that the counsel for the State was improperly permitted to comment, in his
argument, upon the failure of the defense to produce a particular witness
indicated by the evidence. The trial judge, in his explanation of the bill of
exception, recites that he stopped the State's counsel at that period of his
argument, and informed the jury that the defendant had applied for a con-
tinuance because of the absence of the said witness. *Held*, that such action
was ample to protect the defendant against any injury because of the
argument.

APPEAL from the District Court of Grayson. Tried below before
the Hon. R. Maltbie.

The conviction in this case was for the robbery of R. H. Pierce,
in Grayson county, Texas, on the 20th day of October, 1885. The
penalty assessed by the jury was a term of ten years in the pen-
itentiary.

R. H. Pierce was the first witness for the State. He testified that
he was a farmer, and lived near Howe in Grayson county, Texas.
He came to Texas from Tennessee over four years ago. He went
to the city of Sherman on the 20th day of October, 1885, in a
wagon, and put up at a wagon yard in the western part of the city.
It was his recollection that he brought a load of corn to town. His
principal business in town was to attend the trial of a case in the
justice's court, in which he was a witness. He drank nothing on
that day until after 3 o'clock. He then visited several saloons in
the city and drank beer. He may, perhaps, have taken a drink or
two of whisky or brandy, but could not remember doing so. His
usual drink was beer, in which he indulged every time he came to
town. Witness knew George Bridges. He was with George Bridges
at several saloons on the evening of October 20, 1885, and drank
beer with him several times. He could not now say how often or
how much he drank. Witness could not remember at what hour of
the night Bridges left him. The witness was in the Cotton Ex-
change Saloon, situated on the east side of the square, but could not
say that Bridges went with him to that saloon, or that he saw
Bridges in that saloon. To the best of his recollection the witness
met George Leonard in the Cotton Exchange Saloon, and took a
drink with him, but he could not remember what he drank. It was

the witness's recollection, though he was not positive, that he met the defendant in the Cotton Exchange Saloon.

At the Cotton Exchange, Leonard asked witness to go with him to have some fun. Witness went with him across the square to a room over the Crockford Saloon. They entered the room by a stairway which led from the sidewalk. They found three other parties in the room. One of the three was the defendant, and the witness, judging from their appearance, thought that defendant's brother, John Bond, and Bill Kissinger were the other parties. Witness was unable to absolutely identify John Bond and Bill Kissinger, but was morally certain they were the two remaining parties. The parties named sat down to a table and proposed to the witness to join them in a game of poker. Witness did not like the appearance of the crowd and declined. They however dealt a hand to the witness and passed him some checks. Witness again declined, but they claimed that the witness ordered the checks, and said that he should pay for them. Witness denied that he had ordered the checks, but replied that, rather than have a difficulty, he would pay for them. Witness paid for the checks, partly with bills and partly with silver, but could not remember the sum they amounted to. Witness had on his person two pocket-books, one containing $50 in currency — three ten and four five-dollar bills — and $2 in silver, and the other containing $15. He also had a tobacco sack containing eight or ten dollars. He paid for the checks with some of the paper money from the pocket-book containing the $15, and some of the coin from the tobacco sack. He then started down stairs, never up to this time having exhibited the pocket-book containing the $52. One of the parties remarked, as the witness started towards the door: "You have no money is the reason you won't play." The witness then produced his pocket-book containing the $52, and said: "Here I have plenty of money." The lights in the room were instantly turned out. One of the parties seized the witness's left arm, while another wrenched the pocket-book and money from his hand. Some one of them shoved witness towards the door and said, "Go." Witness then called: "Police! Police!" They warned him not to call the police, as he would get himself locked up. Witness replied that he wanted the police, and called "Police!" again as loud as he could. Two of the parties rushed down the stairs and left. Witness did not see what became of the others.

The witness held on to his pocket-book as long as he could, but the strength of the parties prevailed over his. They took the pocket-book and money from the witness's possession by force, and without

his consent.  Witness owned the pocket-book and the money it contained.  The robbery was perpetrated in the dark, and witness was unable to say which of the four parties actually took the money and pocket-book.  The parties who were sitting behind the table when witness first went into the room, he took to be Kissinger and John Bond.  Defendant stood behind the witness and George Leonard to his left, and a little in his front.  Soon after the witness called for the police, Officer Kelly joined him on the sidewalk in front of the Crockford Saloon.  Witness told Kelly about the robbery.  He, witness, then thought that it was the pocket-book which had contained the $15 that was taken from him.  He did not discover that it was the pocket-book containing the $52, until the next morning, when he got up.  Mr. Kelly advised witness to go to bed, and promised to apprehend the parties to the robbery on the morrow.  Witness went to the house of Mr. Moss Ingales, near the Magnolia Mills, and put up for the night.  It was 12 o'clock, according to the city clock and the mill whistle, when the witness reached the neighborhood of the mill, on his way to Ingales's house.  When witness returned to the city on the next morning, he reported the circumstances of the robbery to City Marshal Blain.  Acting upon the advice of the officers, witness disguised himself and searched for the parties who robbed him.  Of the four, he was personally acquainted only with the defendant, whom he knew by the name of Hutchcroft.  The defendant, George Leonard, Kissinger and another party were brought to the witness at the mayor's office during the day, and witness positively identified the defendant and Leonard.  He could not absolutely identify Kissinger, and at once told the officers that the fourth man was not one of the parties who robbed him.  Just as the lights were turned out the witness transferred one of his pocket-books from one pocket to the other, and thought at the time that that pocket-book was the one which contained the $52, and so thought until he discovered his mistake on the next morning.  The witness had counted the $52 into that pocket-book, to take up a certain note of his in bank, which was due on the day after the robbery.

Cross-examined, the witness stated that he had lived in Texas five years.  The last game of chance in which witness participated was played while he was *en route* from Tennessee to Texas.  Witness's business in Tennessee before removing to Texas was that of a patent medicine peddler, with an occasional game at cards as an adjunct.  Witness remembered being at the Globe Saloon of Charley Rabald on South Travis street on the evening of the day of the robbery.

He drank two or more glasses of beer in that saloon, but no whisky. Witness knew Bill Corterbine, the bar-keeper at the Globe Saloon. He had no recollection of showing his money to Corterbine and bantering him to play poker. He may, perhaps, as men in his then condition were liable to do, have said something about being a poker player. Witness left the Globe Saloon at about 7 o'clock P. M. Thence he went to the Bank Saloon, where he met and drank with George Bridges. Witness drank beer at the Bank Saloon. Witness and Bridges then went from the Bank to the Cotton Exchange Saloon, and took another drink or two. Thence they went to the South End Saloon, where they took another drink. Witness had no recollection of giving George Bridges a bottle of whisky at the South End Saloon. He had no recollection of showing his money to Bridges and proposing to play poker with him, or that Bridges declined to play because witness was too drunk. He had no recollection of proposing to stake Bridges to play for him, or that Bridges declined with the remark that he would not play witness's money even if witness owned a million of dollars. He had no recollection of asking Bridges to find him a man to play poker, or of claiming that poker was his game and that he wanted to find somebody to play with. He did recollect that Bridges, at the South End Saloon, advised him to go to bed, and that he told Bridges that he would do so. Witness left the South End at about 11 o'clock and went to the Cotton Exchange Saloon. He supposed that Bridges went home. Witness met Leonard at the Cotton Exchange, took a drink with him, and thence went with him to the room over the Crockford Saloon, where the robbery took place as described. The witness was not too drunk to know what he was doing.

At this point the witness was asked: " Did you not testify on the examining trial as follows: 'I had about me on that day and evening about fifty-eight or sixty dollars. There were fifty dollars in paper money — three ten-dollar bills and four five-dollar bills,— and the rest in silver?' Witness replied: 'I did so testify on the examining trial, and that was about the amount of money I had after I paid for the checks?'" He was then asked: "Did you not on the examining trial after you had been once examined, and all the witnesses had testified, and you was recalled by the State, testify for the first time that you had two pocket-books?" Witness replied: "I was not asked before about the two pocket-books." The State then asked the witness, "Did you not, on the examining trial, testify as follows: 'I had the pocket-book containing the fifty-two

dollars in my left hand pants pocket. I had the fifteen dollar pocket-book in my right hand pocket when I went up stairs?'" Witness replied that he so testified on the examining trial. He was then asked if he had the tobacco sack when he went up stairs. He replied that he did have it, and that it contained then from five to seven dollars, the witness having spent some of its original contents. Witness first discovered that it was the pocket-book containing the fifty-two dollars which was taken from him, on the morning after the robbery. He examined his pockets for that money when he first got up, and discovered that it was the pocket-book containing the fifty-two dollars which was taken. The witness closed his testimony as follows: "I did not tell George Bridges next morning that I was robbed of fifteen dollars. I did not (?) tell him that I had been robbed down by the wagon yard. I told him this to keep from telling him all about it, as I learned that one of the parties who robbed me was related to him. I did not, on the north court-house steps, tell George Bridges that I had only one pocket-book, that it contained the fifty dollars, which money was folded up inside of the money he had seen. I knew before George Bridges told me behind Pete Kirsch's saloon that one of the defendants was his brother-in-law. I had been told that before." (The obvious inconsistency in this testimony probably results from a clerical error, as subsequently appears.)

J. C. Burns was the next witness for the State. He testified that he knew the defendant and George Leonard, and also the prosecuting witness, R. H. Pierce. Witness saw Leonard and Pierce at the Cotton Exchange Saloon about 12 o'clock on the night of the alleged robbery. Defendant was then sitting near the stove, and between witness and Leonard and Pierce. Leonard and Pierce took a drink together at the bar. When they got through they turned from the bar, and Leonard, looking directly at defendant, lifted his hat from his head twice. Defendant immediately left the saloon, going out at the front door. Leonard and Pierce followed a few minutes later. They had been gone but few minutes when Policeman Kelly came into the saloon and sat down by the stove. A moment or two later witness heard the call for "police." He told Kelly that the call came from the neighborhood of the Crockford Saloon. Kelly went to the sidewalk, when the cry for the police was repeated, and he went towards the Crockford. The witness was led to locate the first cry for police, at the Crockford, by what he saw take place at the Cotton Exchange a few — not less than five nor more than ten — minutes before.

Cross-examined, the witness stated that Pierce and George Bridges were together at his saloon (the South End) at about 11 o'clock that night. Pierce was exhibiting money in a pocket-book and a tobacco sack, and talking about wanting to get into a game of poker, which he said was his game at cards. He and Bridges took a drink together at that saloon. Each drank whisky. Pierce bought a small flask of whisky and gave it to Bridges. Bridges told Pierce that he had drunk enough for one night, and to go to bed. This was about an hour before the witness saw Pierce and Leonard at the Cotton Exchange. Witness did not know what Pierce drank at the Cotton Exchange, but from where he was sitting he took it to be whisky. This impression was made by the fact that Pierce took water with the drink. When Leonard lifted his hat as described, he looked at the defendant. Witness sat in the same direction from Leonard, but the look and the signal were not intended for him. Witness thought at the time that Leonard was signaling defendant. From the Cotton Exchange to the Crockford Saloon, the distance was a little over one hundred yards.

R. E. Kelly testified, for the State, that he was a member of the Sherman police force, and was on duty on the night of the alleged robbery. Witness went into the Cotton Exchange Saloon about 12 o'clock on that night, and took a seat by the stove near the witness Burns. He had been in the saloon not exceeding five minutes when he heard the cry, " police!" Burns said that the cry was at the Crockford. The cry was repeated at least twice, and the witness went immediately to the Crockford. He found Pierce standing on the sidewalk at the foot of the stairs, in front of the Crockford Saloon. As he approached, he saw a person walk off towards the postoffice. He took that person to be John Bond, the brother of the defendant. Witness was well acquainted with John Bond, and thought he recognized him as he passed into the moonlight, but was unable to so testify positively. No light was then burning in the room over the Crockford Saloon. Witness saw no one about the place except the witness Pierce. Pierce told witness that he had been robbed. Witness advised him to postpone investigation until morning, and to go to bed. Pierce was drinking, but knew what he was doing. On the next morning the witness took the defendant, with George Leonard, Bill Kissinger and a Fort Worth man, to the mayor's office. They were confronted by the witness Pierce, who was then in an adjoining room. Pierce identified defendant and Leonard as two of the parties who robbed him, said that Kissinger looked like a third, and that the Fort Worth man

had nothing to do with the robbery. The witness arrested Leonard and defendant upon information furnished by Pierce. Neither defendant nor Leonard said a word when Pierce pointed them out as parties to the robbery. The defendant, George Leonard, John Bond, Bill Kissinger and George Bridges had long associated together in the room over the Crockford Saloon, in which the robbery was said to have taken place. Bridges was the proprietor of the Crockford, both down and up stairs, at the time of the alleged robbery, but has since then disposed of the business down stairs.

John Blain, city marshal of Sherman, testified, for the State, that he first heard of the robbery from Pierce on the morning after it was alleged to have occurred. Pierce described the parties to witness. Witness confronted Pierce with four men in the mayor's office. Of those four, Pierce identified defendant and Leonard, but could not identify the other two. Witness was asked if he told defendant why he was arrested. He replied that he did not remember. He was then asked if any one informed defendant why he was arrested. He replied that Pierce stated positively to the defendant and Leonard that they were two of the men who robbed him. Pierce told witness, early in the morning, all of the particulars of the robbery, the amount of money taken, etc. The State rested.

John Bond was the first witness introduced by the defense. He testified that the defendant was his brother. The witness was not in the room over the Crockford Saloon at any time on the night of the alleged robbery, nor at any other time when the prosecuting witness, Pierce, was present. He did not know Pierce, and had never seen him prior to the day after the alleged robbery. He knew nothing whatever, of his own knowledge, of the transaction. The room in which the robbery is alleged to have been committed was entered by a stairway leading up from the sidewalk on the east side of the building.

Jim Harris testified, for the defense, that George Bridges and Pierce were in his saloon (The "Bank") about 9 o'clock on the night of the alleged robbery. Pierce took two drinks of whisky and one of brandy while in that saloon. He was not to say drunk, but was considerably under the influence of liquor. He asked Bridges if there was a place in town where poker was played. Bridges told him that there was no such place in town, and that he was in no condition to play if such a place could be found. Pierce replied that he had plenty of money to play poker with, and exhibited a tobacco sack containing coin which, if silver, amounted to five, seven

or eight dollars; if gold, the witness could not say how much, and a pocket-book which contained only a five-dollar bill, so far as the witness could see.

Bill Corterbine testified, for the defense, that he saw Pierce in the Globe Saloon on the night of the alleged robbery. Pierce was in that saloon when witness, who was bar-tender, went on duty. He drank once of whisky and once of beer, to the witness's knowledge, and the witness considered him drunk. He was intoxicated when the witness first saw him about 7 o'clock on that evening. He proposed a game of draw poker to witness, and when witness declined to play he asked if witness could refer him to a man who would play. This, the witness told him, he could not do.

Ben. Aspinwall testified, for the defense, that he saw Pierce in the Cotton Exchange Saloon about 11 o'clock on the night of the alleged robbery. Witness thought him considerably drunk at that time. Pierce threw dice with George Leonard for drinks. He drank whisky at that saloon with Bridges and others. Witness heard Pierce, while in the Cotton Exchange, say that he could beat any G—d d—d man in the State playing his game of draw poker. Leonard was then near enough to hear what Pierce said. Pierce and Leonard left the Cotton Exchange shortly afterwards. Defendant left either a little before or a little after they did. Witness went to the " Q. T." Saloon, and did not hear the cry for the police. The police was called for about an hour and a half after Leonard and Pierce left the Cotton Exchange. Witness saw Pierce with a pocket-book, and also with a tobacco sack which contained perhaps four or five dollars in silver.

George T. Bridges was the next witness for the defense. He testified that he had known Pierce about two years. Witness met Pierce at the Bank Saloon in Sherman, about 8 o'clock on the night of the alleged robbery. They took two or three drinks of whisky each at that saloon. From the Bank Saloon they went to the Cotton Exchange, where Pierce took two or three drinks of whisky, and the witness one drink and a cigar. From the Cotton Exchange they went to the South End Saloon, where they remained, talking and drinking, for some time. Pierce bought and gave to the witness at the South End a bottle of whisky which he insisted witness should take home for morning use. While at the Bank Saloon Pierce asked if witness knew of any place where he could have fun,— get a game of poker, at which he was an " old timer," as he used to follow poker for a living. Witness told him that he knew of no gambling place in Sherman. Pierce then said that he would back

witness to any amount in a game. Witness replied that he would not play his, Pierce's, money, and that as he, Pierce, was drunk, he would not see him play. Pierce was drinking heavily when witness first met him, and was drunk when witness left him, about 11 o'clock, at the South End Saloon. Witness saw him display his money in every saloon he went into. He had a tobacco sack containing five or six dollars in silver, and a pocket-book containing two five-dollar bills, which was all the money witness saw him have at any time. At each of the saloons Pierce threw his sack of silver on the counter, and invariably remarked that the silver was not all the money he had, and he would then exhibit the pocket-book and the two five-dollar bills. He exhibited the money in his efforts to get up a game of poker, and made the display in order to show that he had money to gamble with. He did not show any other money than that described by witness, and the witness did not believe that he had any other money, or more than the one pocket-book. Pierce spent two and a half or three dollars while with the witness, and during that time drank nothing but brandy and whisky. He was very drunk when the witness left him. He promised witness, on parting with him, that he would put up at the hotel.

On the following morning the witness met Pierce in front of the Crockford Saloon. He had been clean shaved, his mustache was dyed, and he wore a pair of colored spectacles, and witness did not know him until he pinched witness on the arm. Witness asked him why he had so disguised himself. He replied that he had been beaten out of $15 after he parted with witness on the night before, and that witness would soon hear all about it. An hour or two later the witness met Pierce again at the Crockford Saloon, and Pierce told him that he was robbed by four men of $52 near the wagon yard. Witness met him a third time near Kirsch's saloon, and told him that he, Pierce, must excuse him for asking particularly about the robbery, inasmuch as one of the parties arrested for the crime was his, witness's, brother-in-law. Witness told him also that he was a friend to him, Pierce, and that, if the defendant had anything to do with the robbery, he, witness, was no friend to defendant, and would not uphold him in the robbery. Pierce replied that he had never before heard that witness and defendant were brothers-in-law, and that he was sorry to hear it then. During the examining trial, the witness met Pierce on the court-house steps, and asked him: "Pierce, how much do you say you lost?" He replied: "I lost $52." Witness asked him where he had that money while with him, and at the same time with two pieces of paper illus-

trated how the two five-dollar bills were folded and placed in the pocket-book. He replied that the $52 were folded under the two five dollar bills, and that it was in the same book which contained the two five-dollar bills. Witness first heard that Pierce claimed to have lost the $52 from a separate pocket-book, after the examining trial. Witness was asked nothing about the conversation on the court-house steps at the examining trial.

Cross-examined, the witness stated that he was with Pierce from 8 until 11 o'clock on the night of the alleged robbery, and could not get away from him during that time. Pierce did all of the treating and would not permit witness to pay for a single service of drinks. Witness had known, and been closely associated with Bill Kissinger for more than twenty years, during which time he and Kissinger had been close, intimate friends. Kissinger was present at the examining trial of the defendant and Leonard, but was not examined as a witness.

G. W. Pasco testified, for the defense, that he appeared as counsel for the defendant and Leonard on their examining trial. Pierce testified that he had two pocket-books, for the first time, when he was recalled by the State, which was after all of the other evidence had been taken.

William Loving testified, for the defense, that he heard the conversation between Bridges and Pierce on the court-house steps mentioned by Bridges in his testimony, but did not pay much attention to what was said. The subject discussed was money, and Bridges did most of the talking, manipulating two pieces of paper. Pierce said nothing about two pocket-books,— in fact he said nothing that witness heard. The defense closed.

R. H. Pierce was recalled by the State in rebuttal, and testified that he had no conversation upon any subject with Bridges on the morning after the robbery, at or near the Crockford Saloon. He did not see Bridges at or near that saloon on that day. He did have a conversation with Bridges in the back yard of Kirsch's saloon on that day. Bridges called witness into the yard to talk about the robbery. Witness had learned that Bridges and defendant were brothers-in-law, and, as he wanted to mislead and "throw off" Bridges, witness told him that he was robbed near the wagon yard. Bridges seemed very — indeed, intensely— anxious to find out all about the robbery. Witness had no conversation with Bridges about the case on the court-house steps during the progress of the examining trial. Bridges tried then, there, and elsewhere to get witness to discuss the matter, and witness emphatically refused to

do so. Witness had but little recollection of the time of occurrences on the night in question, prior to the robbery. Witness could recollect the time indicated by the clock and whistle with reference to the time of the robbery. After he paid for the checks witness had some fifty-eight or sixty dollars on his person. Witness reported all of the facts to the officers on the morning after the robbery, but was asked nothing about having two pocket-books when first examined on the examining trial. Witness assumed his disguise because advised by the officers to do so.

The defendant's application for continuance, referred to in the third head-note of this report, set out that defendant expected to prove by the absent witness Kissinger that he was present on the night that Pierce claimed to have been robbed; that Pierce was not robbed, but that, after much bantering and importunity, he prevailed upon a party of several persons, including defendant and Leonard, to engage in a game of poker; that Pierce in that game bought drinks and checks to the amount of $15, which was all the money he had, according to his own statement on that night, and that he subsequently lost the checks so purchased, in the said game of poker.

The motion for new trial raised the questions discussed in the opinion.

ARGUMENT FOR APPELLANT ON MOTION FOR REHEARING.

*Hare, Head & Hare* and *A. C. Turner*, for the appellant. The State in its motion for a rehearing of this cause claims that article 722 of the Penal Code, as amended by the laws of the Eighteenth Legislature, page 81, has changed the definition of robbery so that the same may be committed simply "by putting in fear of life or bodily injury," and that said amendment of 1883 defines and punishes robbery without any of the ancient elements of assault, force and violence as connected with said offense. We do not understand such to be the purport of said amendment; for we hold that the Legislature in the amendment of 1883 only intended to change the penalty of robbery. The whole question turns upon the intention of the Legislature in using the word "or" connecting the words "violence" and "by putting in fear," etc. There can be but one reasonable and sensible construction of this word "or" in the statute referred to, and that is, to render the same "and." To put any other construction on the legislative intent would be to break down and destroy the other provisions of the Code as contained in articles 647, 648, 649 and 723, especially the latter clause.

Article 723 of the Penal Code defines and punishes robbery by putting in fear of, not only life and bodily injury (of the person), but also of character and property. By the English common law, the phrase "putting in fear" referred to threatened injuries to the person, to the character and to the property of another. (Russell on Crimes, marginal p. 879.) All taking at common law by threats of injuries to person, to character and to property, was a taking by "putting in fear," and consequently constituted robbery. (Russell on Crimes, pp. 880, 881 and 882.)

But the Penal Code of this State has divided common law robbery into two distinct parts or offenses, the first of which is contained in article 722, and includes the offense as applicable to assault and violence; the second in article 723, as applicable to robbery accomplished by threats of injury to the character, person or property. If the word "or" in the act of 1883 is given its strict meaning, then we have robbery accomplished by putting in fear of life and bodily injury alone, disconnected from assault or violence — a construction of the law which runs directly back to the common law, and which repeals article 723 of the Penal Code, as well as does away with or repeals articles 648 and 649 of the Penal Code. There can be no robbery under article 722 as it is now or formerly existed without assault or violence being connected with it; a robbery by putting in fear alone in this State can only relate to and be embraced in article 723. That this court has the right so to construe this statute as to make the same intelligible, and to conform to the legislative intent, and at the same time to support all the law bearing on the question of robbery as found in the Code, there can be no question.

In this connection we refer the court to *Walker* v. *The State*, 7 Texas Ct. App., 245, with the authorities therein cited, for a clear exposition of the law in the construction of statutes and arriving at the legislative intent. This decision clearly holds that words may be set aside to arrive at the intent of the Legislature. We submit that, unless this construction of article 722 is adopted by the court, the whole of article 723 becomes inoperative, because in conflict with other written laws of the State. (See Penal Code, art. 6.)

In the original opinion it does not appear that the court passed upon the several bills of exception taken by the defendant. Now, however this case may be decided, we deem it of importance in practice that the court declare the law upon the exceptions taken, and we respectfully and especially again call the attention of the

court to the rulings on the application for a continuance; to the exclusion of defendant's brother from the court room when not a witness; to the remarks made by the judge in the hearing of the jury, in substance that it did not seem defendant wanted a fair trial, and that he was making a technical defense. (See Code Crim. Proc., art. 729, p. 87.) If these things are to be tolerated, the profession ought to know it. By singling out these points, however, we do not wish to be understood as waiving the exceptions contained in the other assignments of error, but we deem them of importance and ask the opinion of the court upon them.

*J. H. Burts*, Assistant Attorney-General, for the State. 1. The charge as given by the court was all that was demanded by the evidence. There was an assault and violence resorted to by appellant and his accomplices, and no evidence that the money was merely snatched from the hands of the injured party, unaccompanied by an assault and violence; and hence the charge requested on this supposed issue was properly refused. (*Shultz* v. *The State*, 5 Texas Ct. App., 390; *Johnson* v. *The State*, 27 Texas, 758; *Maria* v. *The State*, 28 Texas, 698; *Bishop* v. *The State*, 43 Texas, 390; *Rogers* v. *The State*, 1 Texas Ct. App., 187; *Bronson* v. *The State*, 2 Texas Ct. App., 46; *Merritt* v. *The State*, 2 Texas Ct. App., 177; *Hutto* v. *The State*, 7 Texas Ct. App., 44; *Smith* v. *The State*, 7 Texas Ct. App., 414.)

2. The first special instruction requested by appellant was properly refused for the reason that everything contained therein applicable to the case had been embraced in the general charge, and was given, and needed not to be repeated. (Clark's Criminal Law, p. 519, note 208; *Heard* v. *The State*, 9 Texas Ct. App., 1; *Brown* v. *The State*, 9 Texas Ct. App., 81; *Allison* v. *The State*, 14 Texas Ct. App., 402; *O'Neal* v. *The State*, 14 Texas Ct. App., 582; *Reynolds* v. *The State*, 17 Texas Ct. App., 413.)

3. There is no error in the ruling on the application for continuance, because, had subpœnas been issued in time, the service of the same might have been had on the witness. In the short space of time which elapsed from the time the injured party went to the place where he was robbed and the robbery, as shown by all the evidence, he could not have entered into and played out the games to the end and the loss of his money. If the witness had so testified, his evidence could not be true, but would have been false; and hence there was no error in overruling the application, or his motion for a new trial.

4. It is shown by the evidence of John Bond that he frequented

the place where the robbery occurred, and from other evidence that John Bond was there that night, and was an accomplice to defendant in the robbery; and it was not error for the court to order him under the rule. As it was, he was placed on the stand by appellant and contradicted the prosecuting witnesses as to his presence, which, as impeaching testimony, was material and shows the importance of the order placing him under the rule.

Before the Revised Codes were enacted the statute defining robbery was as follows:

"If any person, by assault or violence, and putting in fear of life or of bodily injury, shall fraudulently," etc. This statute required the element of "putting in fear of life or of bodily injury" to attend the *assault* or the *violence* in robbery, as a *necessary* concomitant. (3 Texas Ct. App., 63.)

When the Penal Code was enacted in 1879, the statute was changed, thus:

"If any person by assault, or by violence and putting in fear of life or bodily injury, shall," etc. This permitted the offense of robbery to be committed *by assault* without the "putting in fear of life or bodily injury;" but not so when only *violence* was used. (12 Texas Ct. App., 240.)

The act of 1883, page 81, amends the law of robbery, both as to the *definition* and the *penalty*,— thus: "If any person by assault or by violence, or by putting in fear of life or bodily injury, shall," etc.

Thus, you see that robbery can be committed *by assault, or by violence*, without there being any "putting in fear," etc., or it can be committed "by putting in fear of life or bodily injury" without assault or violence. (See Wharton's Cr. Law, 135; Archbold's Criminal Pleading, 25, 202, 271; 43 Texas, 519; also 2 Texas Ct. App., 39, and cases cited.

#### ON MOTION FOR REHEARING.

WHITE, PRESIDING JUDGE. At a former day of this present term this case was reversed and remanded for a supposed error in the charge of the court, occasioned by inadvertence upon our part in overlooking the full extent to which the act of April 12, 1883 (Genl. Laws, 18th Legislature, Regular Session, page 81), had gone in the amendment made to article 722 of the Penal Code, defining and punishing the crime of robbery.

This amendment reads: "If any person by assault or violence, *or* by putting in fear of life or bodily injury, shall fraudulently take

from the person or possession of another any property, with intent to appropriate the same to his own use, he shall be punished by confinement in the penitentiary for life or for a term of not less than five years; and when the offense is committed by two or more persons acting together, and a fire-arm or other deadly weapon is used or exhibited by either of them in commission of the offense, the person or persons so using or exhibiting the fire-arm or other deadly weapon shall be punished by imprisonment in the penitentiary for life or for a term not less than five years." This amendment changes the old law definition of the offense in one important particular, to wit: by using the disjunctive "*or*" where the conjunctive "*and*" had formerly been used between the words "violence" and the words "by putting in fear of life or bodily injury."

This is the second time the definition of the offense has been changed since the adoption of our Codes in 1858. Originally it was "by assault or by violence, and putting in fear of life or bodily injury," and the proper construction then was that whether "by assault" "or by violence," in either event there must be the accompanying condition that there was a "putting in fear of life or bodily injury," and the indictment was required so to allege. (*Wilson* v. *The State*, 3 Texas Ct. App., 63.) Next came the change made by the revision of 1879, which was that if the property was taken by assault the offense was complete whether the person from whom taken was or not put in fear of life or bodily injury; whilst, if it was taken "by violence," then, to make the crime complete, it was requisite that the "violence" should be such as amounted to a "putting in fear of life or bodily injury," and "violence" not thus accompanied could not constitute the offense. (*Williams* v. *The State*, 12 Texas Ct. App., 240; *Kimble* v. *The State*, 12 Texas Ct. App., 420; *Trimble* v. *The State*, 16 Texas Ct. App., 115.) Under these previous laws there were two modes by which the offense might be committed, that is, 1st, "by assault," and 2d, "by violence," the putting in fear, etc., being a condition annexed to the latter mode before article 722 was amended as above set out.

We think it clear from the amendment that the legislative intent, by the use of the disjunctive "or" between "violence" and "putting in fear," etc., was to create another, and established thereby three modes by which the offense might thereafter be committed; — viz.: 1st, by assault; 2d, by violence; and 3d, by putting in fear of life or bodily injury, each being a separate and distinct mode within itself, whether connected and accompanied or not by either of the other two modes.

It is true that by a well known rule of construction, where the legislative intent and meaning is plain, exact grammatical propriety of language may be disregarded and the conjunctive "and" will be read as "or," and "or" as "and," when the sense obviously so requires; and this in plain cases, even in criminal statutes, against the accused. (Bish. Stat. Crimes (2d ed.), § 243; *Frazier* v. *The State*, 18 Texas Ct. App., 434.) Such liberty is, however, unauthorized when the words used appear to harmonize with the evident intention as expressed by them. We are of opinion that the Legislature intended to make three modes instead of two by which robbery could be committed, and that "violence" is of itself one mode, without the aid of either of the others. The learned trial judge so in effect charged the jury in the paragraph upon which we based the former reversal of the judgment. We are clearly of opinion that his charge was in strict conformity with the amendment of the law, and that the error with regard to the law as to this phase of the case was one of our own and not his.

The previous judgment reversing the case will therefore be set aside, and we will proceed to dispose of the other questions submitted by appellant as grounds for reversal.

1. In so far as defendant's special requested instructions presented sound propositions of law, they were covered by the charge of the court to the jury, and it was not error to refuse them.

2. The application for continuance on account of the witness Kissinger was properly overruled. Sufficient diligence is not shown. Defendant's second subpœna for said witness was returned on the 14th "not found;" the trial was on the 24th, and no steps were taken by defendant for the ten days intervening between the 14th and 24th to secure the attendance of his witness. In addition to this want of diligence, we are of opinion that the matter proposed to be proven by said witness, when the evidence adduced is considered, would not probably have been true had the witness testified to the same.

3. Defendant's second bill of exceptions shows that "the rule" had been invoked for the witnesses, and, when they were called for the purpose of being sworn and placed under the rule, the State's attorney called John Bond, a brother of defendant, who had not been summoned as a witness for either side, and requested that he also be sworn and put under the rule with the other witnesses for the State. Defendant's counsel requested the court to ask State's counsel if he intended to use John Bond as a witness, and, if not, that defendant wished him released from the rule so that he might

have this witness's assistance on the trial. The State's counsel, after a wordy altercation between the attorneys about the witness, finally told the court that he might wish to use the party as a witness, and the court had him placed under the rule with the other witnesses, over defendant's objection and in refusal of his request to have him remain in the court room to assist by his advice in the conduct of the defense.

A wide discretion is confided necessarily in the trial judge with regard to the application and the extent of the application of "the rule" to witnesses, and the exercise of this discretion will not be revised except in clear cases of abuse. (*Kennedy* v. *The State*, 19 Texas Ct. App., 640, where the authorities are collated.) "The order for the removal of the witnesses from the court, being a matter within the discretion of the presiding judge, may be put in such form as to meet the particular demands of justice and convenience in the individual case. If, for example, the assistance of some of the witnesses is required in conducting the prosecution or defense, these may be permitted to remain while the rest are excluded. So the witnesses who are summoned as experts, and an attorney in the cause, and witnesses called to testify to the character for truth and veracity of a witness, may all be permitted to remain in the court room while the rest are sent away." (*Brown* v. *The State*, 3 Texas Ct. App., 295; 1 Bish. Crim. Proc. (3d ed.), §§ 1188–1190; Code Crim. Proc., art. 662.)

It is not made to appear that the court abused its discretion in this instance, and the bill of exceptions fails to show any reason why the witness John Bond was even supposed to be indispensable to defendant in his defense of the case, further than that he was a brother of defendant.

4. The prosecuting witness was asked by the State's counsel the question "are you a farmer?" and defendant's counsel objected that the character nor trade nor business of the witness were not in issue, and that the answer would be immaterial and irrelevant. The objection was overruled. If the question and answer were, as contended, inadmissible, which is not conceded, then we cannot see what possible injury could result to defendant, and it would simply amount to error without prejudice, which is not reversible error. The erroneous admission of evidence is no ground for reversal when the appellant could not have been prejudiced by the evidence admitted. (*State* v. *Hallett*, 63 Iowa, 259; *Evans* v. *The State*, 13 Texas Ct. App., 225; *Gose* v. *The State*, 6 Texas Ct. App., 121.)

5. A somewhat similar objection is shown by the fourth bill of

exceptions, and, though the question may have been irrelevant and immaterial, we cannot see how injury could inure to the defendant.

6. We cannot see how the question asked the policeman Kelley, "if he arrested the defendant?" was "calculated to influence the jury to accept the opinion of the police as to who had committed the offense." If this is the rule with regard to such a question, then the State would never be able to prove, no matter how important, who had, or which one of her officers had, made an arrest of a party who had committed a crime. We think the objection was a strained conclusion as to what would necessarily be the result of the question and answer. Of course an officer would hardly be presumed to arrest a party for crime unless he had a warrant which authorized him to do so, or had seen him commit the crime, or had good reason to believe that he had committed it. The very fact of arrest is ordinarily evidence that, in the opinion of some one, the arrested party has committed an offense. But there would be about as much reason in objecting to an indictment's being read in the hearing of the jury, for fear they might be influenced by the opinion of the grand jury as to the guilt of the accused. And yet it is a matter of daily experience that parties are not only arrested but may be also indicted for crime, and juries, uninfluenced by the opinions of officers and grand jurors as thus evinced, find them not guilty without the slightest hesitancy.

7. On the argument about one of the exceptions saved by counsel for defendant, and what it should contain, counsel remarked to the court "all that defendant wants is that the record speak the truth as to what has transpired, and that defendant have his rights and be awarded a fair trial;" when the court rejoined, "it does not seem that way to me or there would not be all this wrangling." This was said in presence of the jury. "The court explained to the jury that in using said language he intended to convey the idea and meant that he thought the attorneys for defendant were trying to get some technical advantage in the case," and defendant's counsel excepted to the explanation as well as to the original remark.

The remark of the judge was doubtless provoked by the manner of counsel in making his remarks. Still, this did not justify the reply of the court that it did not seem to him that defendant only wanted the record to speak the truth and that he have a fair trial, or there would not be so much wrangling. That was not the proper or legal manner for the court to express disapprobation at or to stop the wrangling. On the contrary, it looks very much as if the court felt disposed to engage in the wrangling himself,— a course of con-

duct a court should never suffer itself to be entrapped into, and especially so when it has ample power and authority by fine and imprisonment, if need be, to control and stop all unnecessary "wrangling," or disorders of any other kind which are violations of proper decorum or calculated to impede or obstruct the trial of a cause. The remark of the court was, to say the least, inconsiderate if not improper; and the explanation made to the jury of the remark was, in our opinion, much more objectionable and improper than the remark itself, because it was a charge that the attorneys were endeavoring, in their effort to get a bill of exceptions, to obtain some technical advantage in the trial. They were either entitled to the bill or they were not, and it was the duty of the judge either to allow or refuse it, just as the right of the matter might be, without discussing the motives which prompted counsel in asking its allowance. It is a right given by law to a party to reserve exceptions to any adverse ruling he may deem erroneous; and no right accorded a party by law, especially in a criminal prosecution, is in any manner *a technical* right or advantage when properly availed of. The rules provided by the State for the government of criminal trials, when she seeks to hold her citizen amenable, are not technicalities if he insists upon a compliance with them on the part of the State. They are *rights*, and it is the veriest misnomer to call them *technicalities*. There are no technicalities in criminal law under a Code practice, where every step of the procedure is clearly provided for and defined. Erroneous remarks of a judge in the presence of the jury may, and sometimes do, demand a reversal of the judgment rendered (61 Iowa, 369), and judges cannot be too careful in making remarks having the slightest tendency to impress the jury with the opinion the judge may entertain of the merits or demerits of the case or any matter of evidence upon which the jury alone should pass. But, whilst we hold that the remark and explanation in this instance were highly objectionable and improper, we cannot say that in and of themselves they afford ground sufficient to call for a reversal of the judgment.

8. The witness Blain was asked "if any one informed defendant of the cause of his arrest?" and he answered "yes, R. H. Pierce (the prosecuting witness) said there are the two men that robbed me last night"— pointing to defendant and George Leonard. It was objected that this was hearsay. If we understand the exception, the evidence was not hearsay; the statement of Pierce was made to defendant. But if hearsay and erroneous, the error is harmless because Pierce, when on the stand, had testified substantially to the

same fact, and stated that he had identified the defendant and Leonard when brought by the police to him at the mayor's office.

9. In answer to the question propounded to the witness and objected to in the eighth bill of exceptions, the witness answered that "he did not know," and, whilst the question may have been improper or illegal, it does not appear to have injured defendant, as the witness did not and could not answer it.

10. Bill of exceptions number ten has reference to the action of the court in placing John Bond back under "the rule" after he had testified, and refusing to allow him to remain in the court room to advise and counsel with defendant and his attorneys about the case. For the reasons stated above with regard to the third bill of exceptions, we hold that this bill does not show reversible error.

11. Bill of exceptions shows no reversible error. In answer to the question "what was defendant's business?" the witness answered that "defendant painted, but he did not know his business." The witness was also asked if Kissinger (the witness for whom defendant had sought a continuance) was present when defendant was on his examining trial, and if so, whether he, Kissinger, testified; and witness answered that Kissinger was present and did not testify.

12. Bill of exceptions is a rehash of defendant's thrice told tale of the injustice done him by depriving him of the presence, assistance, advice and counsel of his brother, John Bond, and the keeping of him under the rule during the trial.

13. The judge's explanation to the twelfth bill of exceptions is that the court stopped the county attorney in his remarks about the non-production by defendant of the witness Kissinger on the trial, and informed the jury that defendant had applied for a continuance on account of the absence of Kissinger. This certainly should have corrected any improper impression the county attorney was seeking to make on account of Kissinger's absence, and was the proper course, if not the only one the court could take in the matter.

14. This last bill of exceptions is one saved by the county attorney to the ruling of the court in excluding evidence of the confessions made by defendant whilst he was in jail. The question presented is quite an interesting one, but we do not see what the county attorney wanted with these confessions when he had ample evidence without them, or why he should wish us to decide it when it is unnecessary to a disposition of the case. However, without going into the merits of the matter, we deem it sufficient to state that in this particular we see no error in the ruling of the court.

We have discussed every bill of exceptions and every point of

442      20 TEXAS COURT OF APPEALS.      [Galv. Term,

Statement of the case.

any moment presented in this record. Learned counsel for appellant in an able printed brief have done themselves much credit by the manner in which they have presented their views upon many of these points; and on the motion for a rehearing in connection with their argument they have most earnestly requested that we would examine and decide each question raised by them if the rehearing was granted. We have endeavored to do so, and our conclusion is that no ground assigned as error and no question submitted on the record presents reversible error; wherefore the judgment is affirmed.

*Affirmed.*

[Opinion delivered February 27, 1886.]